AO

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

3/23/23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

███████████████, including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings (Target Location 4)

)
)
)
)
)
)

Case No.     3:23-mj-110

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A-4

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a)(1) and 846 | Possession with intent to distribute a controlled substance and Conspiracy |
| 21, USC § 843(b) | Unlawful use of a communications facility |
| 18, USC §§ 1956 and 1957 | Money Laundering |
| 18, USC § 1343 | Wire Fraud |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JASON BARNES (Affiliate)   Digitally signed by JASON BARNES (Affiliate)
Date: 2023.03.23 12:29:34 -04'00'

*Applicant's signature*

TFO Jason M. Barnes, DEA

*Printed name and title*

Sworn to before me and signed in my presence via telephone.

Date: March 23, 2023

City and state:  Dayton, Ohio

Caroline H. Gentry
United States Magistrate Judge

<u>AFFIDAVIT</u>

I, Jason Barnes, having been duly sworn, do hereby state and depose as follows:

1.      I am a Task Force Officer ("TFO") with the U.S. Drug Enforcement Administration ("DEA"), and have been since January of 2019.   I have been employed in law enforcement since December of 2001.   I currently serve as an officer with the Dayton Police Department ("DPD"). I have been assigned to Patrol Operations and am currently assigned to the Narcotics Bureau.   I have extensive prior experience in investigating drug cases that resulted in the successful prosecution of persons involved in trafficking of drugs, possession of drugs, and gun-related offenses.   I have conducted narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics and weapons, participated in undercover narcotics purchases, and supervised the activities of informants who have provided information and assistance resulting in narcotics purchases.   Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution and sales of controlled substances often operate.   These subjects usually attempt to conceal their identities and the locations at which they reside, operate, and/or store drugs and drug proceeds.

2.      I am a Task Force Officer of the DEA, assigned to the Dayton Resident Office.   As such, I am an "investigative or a law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 801, *et. sec.*, and Title 18, United States Code, Section 2516.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

1

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## I.

## PURPOSE OF AFFIDAVIT

4.     I make this affidavit in support of search warrants associated with a drug trafficking organization operating in the greater Dayton, Ohio area. The application seeks the issuance of search warrants for the following addresses, collective the "Target Locations":

a.     2030 Aspen Ridge Ct., Miami Township, Ohio, including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 1). Target Location 1 is more fully described in Attachment A-1, which is incorporated herein by reference.

b.     ███████████████████ including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 2). Target Location 2 is more fully described in Attachment A-2, which is incorporated herein by reference.

c.     ███████████████████ including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 3). Target Location 3 is more fully described in Attachment A-3, which is incorporated herein by reference.

d.     ██████████████████, including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 4). Target Location 4 is more fully described in Attachment A-4, which is incorporated herein by reference.

2

e.        █████████████████████ including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 5).  Target Location 5 is more fully described in Attachment A-5, which is incorporated herein by reference.

f.        2412 North Gettysburg Ave., Dayton, Ohio, specifically to include the entire area within the fence line, main building, the curtilage, any vehicles located within the curtilage at this location, but not to include any separate secure buildings (hereinafter Target Location 6).  Target Location 6 is more fully described in Attachment A-6, which is incorporated herein by reference.

g.        █████████████████████ including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 7).  Target Location 7 is more fully described in Attachment A-7, which is incorporated herein by reference.

h.        ██████████████████████, Dayton, Ohio, including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 8).  Target Location 8 is more fully described in Attachment A-8, which is incorporated herein by reference.

i.        ███████████████████████, including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 9).  Target Location 9 is more fully described in Attachment A-9, which is incorporated herein by reference.

j.        ███████████████████████ including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location

3

(hereinafter Target Location 10).   Target Location 10 is more fully described in Attachment A-10, which is incorporated herein by reference.

        k.     1588 Glenbeck Ave., Apt. B, Kettering, Ohio, including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 11).   Target Location 11 is more fully described in Attachment A-11, which is incorporated herein by reference.

        l.     ████████████████ including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 12).   Target Location 12 is more fully described in Attachment A-12, which is incorporated herein by reference.

        m.     806 Goodlow Ave., Dayton, Ohio, including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with this location (hereinafter Target Location 13).   Target Location 13 is more fully described in Attachment A-13, which is incorporated herein by reference.

        5.     As detailed more fully below, based upon the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, and the fruits associated with the following federal felony offenses (collectively, "Target Offenses") is being stored at or can be found in the Target Locations, including surrounding curtilage, outbuilding, or garages and/or storage units associated with those properties:

        a.     Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

        b.     Unlawful use of a communications facility, in violation of Title 21, United States Code, Section 843(b);

4

c.      Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

d.      Money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957; and,

e.      Wire fraud, in violation of Title 18, United States Code, Section 1343.

6.      Based upon my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the premises described above.

## II. OVERVIEW OF INVESTIGATION

**A.      <u>Background Investigation into SMITH and other DTO members</u>**

7.      The DEA Dayton Resident Office (DRO) has been conducting an ongoing investigation into Thomas SMITH[1] and several other individuals believed to members of the same drug trafficking organization (DTO).    These other individuals include Gregory BURNS[2], █████████████ Daniel KISNER, █████████████████, Marvin WEAVER, ██████,

---

1. SMITH is currently on probation for Sexual Battery, Attempt to Commit Sexual Battery, and Sexual Imposition with Montgomery County Adult Probation for a period of 5 years.   Pursuant to the terms of SMITH's community control as stated in the Termination Entry, SMITH shall not be in any building, structure, room, vehicle, or place when he knows or has reasonable cause to know that illegal drugs, stolen property, or firearms are present.   Investigators spoke with SMITH's probation officer and learned that SMITH reported that he is homeless and does not have a current residence.   SMITH also reported to his probation officer that he is self-employed and does remodeling and construction on houses.

2. BURNS's criminal history includes the following drug-related convictions: a 2006 possession of cocaine conviction in Montgomery County, Ohio; a 2007 trafficking in drugs conviction in Montgomery County, Ohio; and, a 2007 trafficking in heroin conviction in Montgomery County, Ohio.

██████████ , and several unknown males.[3]  Based upon the investigation and connections that SMITH has with other known drug traffickers, investigators believe that the DTO are trafficking cocaine in the Dayton, Ohio area and may also be trafficking methamphetamine and fentanyl. Investigators believe that SMITH and others are using several locations in furtherance of their drug trafficking activities.  Additionally, investigators believe that the DTO's members' residences also have relevant information associated with the drug trafficking activities, including their cellular phones, as well as records relevant to the money laundering aspect of the investigation.

**B.**     **Investigation**

8.      The investigation into this DTO started in early 2022 and has been ongoing through the present.   Investigators have utilized multiple investigative techniques, set forth in more detail below. As part of the investigation, law enforcement has sought and obtained GPS tracker warrants on two vehicles associated with SMITH.   Law enforcement originally received authorization to place a GPS tracker on SMITH's White Cadillac Escalade starting in June 2022 and has renewed that authorization through February 23, 2023.   In June of 2022, SMITH was primarily driving the Escalade.   Law enforcement was able conduct surveillance on SMITH while monitoring the GPS tracker on the Escalade.   For example, on September 21, 2022, law enforcement was able to observe SMITH exit the Escalade and walk to the front of Target Location 2.   Surveillance ended a short time later.   Law enforcement commonly conducted stop reports (locations of where Escalade stopped) on the Escalade.   Law enforcement noted the Escalade had been stopped in the area of Target Location 9 and Target Location 10.   Law enforcement did not physically observe

---

3. This affidavit references Unknown Males as UM with the last four digits of the UM's phone number, e.g. UM 4908.

the Escalade at Target Location 9 and Target Location 10. Law enforcement was able to conduct surveillance on SMITH based on the GPS tracker on the Escalade being in the area of Target Location 6. Law enforcement monitored a pole camera on the northern gate and area just east of the northern gate at Target Location 6. The pole camera frequently placed the Escalade at Target Location 6. As the investigation continued, law enforcement noted that the Escalade was showing stopped at Target Location 1 for long periods of time. Based upon this information, law enforcement believed SMITH was driving unknown vehicles.

9. Law enforcement has also sought and obtained a GPS tracker warrant on a GMC flatbed tow truck. The flatbed tow truck is registered to █████████ (hereinafter referred to as ██████, but law enforcement's surveillance has only seen SMITH drive the flatbed tow truck. Law enforcement originally received authorization to place a GPS tracker on the flatbed tow truck starting in January of 2022. Law enforcement noted the flatbed tow truck was frequently at Target Location 1. For example, on January 11, 2023, law enforcement was conducting a court authorized wiretap on SMITH's phone 937-838-5454. Law enforcement intercepted a call to SMITH's phone 937-838-5454 from Daniel KISNER (hereinafter referred to as KISNER). Based on coded talk, law enforcement believed SMITH and KISNER were going to meet to conduct a drug transaction. The GPS tracker on the flatbed tow truck placed the vehicle in the area of Target Location 1. Law enforcement monitored the GPS tracker on the flatbed tow truck as it traveled to the rear of Target Location 2 and Target Location 3. Law enforcement conducted surveillance on the flatbed tow truck and observed SMITH return to the flatbed tow truck and leave the area. Surveillance was maintained on the flatbed tow truck as it traveled to a carwash on in the area of North Dixie Drive and Needmore Drive. Law enforcement observed the flatbed tow truck meet up with a Dodge Ram truck driven by KISNER. Law enforcement

observed SMITH lean into KISNER's truck. The GPS tracker on the flatbed tow truck frequently placed the vehicle at Target Location 6. However, during surveillance law enforcement has also observed SMITH drive other vehicles in addition to these vehicles.

10.    DEA has also sought and obtained phone ping warrants for SMITH for a period from September 2022 through October 14, 2022; Gregory BURNS (hereinafter referred to as BURNS) for a period from September 2022 through October 14, 2022; and others who were later intercepted during a court-authorized wiretap. Law enforcement monitored ping data for SMITH. The ping data commonly placed SMITH's phone in the area of Target Location 1 at times when law enforcement believed SMITH to be sleeping. The ping data commonly placed BURNS' phone in the area of Target Location 12 at times when law enforcement believed BURNS to be sleeping.

11.    DEA utilized pole camera located outside Target Location 6. A pole camera is a surveillance camera installed on a telephone pole with a power source; the camera is then directed toward a publicly viewable space near a location of interest, such as Target Location 6. Law enforcement monitored the pole camera at Target Location 6. The Escalade and flatbed tow truck were frequently captured on the pole camera coming to and from Target Location 6 during daytime hours and nighttime hours. Based on the pole camera video, it appears SMITH has access to the entire property at Target Location 6.

12.    Law enforcement has conducted hours of street surveillance, electronic monitoring, and aerial surveillance. During the surveillance, law enforcement has learned that SMITH commonly travels to Target Location 2 and Target Location 3 prior to conducting what law enforcement believes to be drug transactions with SMITH's customers. Law enforcement was

8

able to use a cooperating defendant (CD-1) during controlled purchases to verify that SMITH in fact travels to Target Location 2 and Target Location 3 prior to conducting drug transactions with CD-1.  Surveillance has linked SMITH and/or SMITH DTO members to numerous locations in and around the Dayton, Ohio area, including all Target Locations listed above.

13.     On December 21, 2022, DEA sought and received orders from the Honorable Michael J. Newman, District Court Judge of the United States District Court for the Southern District of Ohio, authorizing interception of wire communications over telephone number 937-838-5454, the cellular telephone used by SMITH.  DEA has executed Judge Newman's orders, and between the dates of December 27, 2022 to January 25, 2023, it has intercepted wire communications between SMITH at 937-838-5454 and various individuals involving drug transactions as detailed below.

14.     On February 17, 2023, DEA sought and received orders from the Honorable Michael J. Newman, District Court Judge of the United States District Court for the Southern District of Ohio, authorizing interception of wire and electronic communications over telephone number 937-838-5454, the cellular telephone used by SMITH.  DEA has executed Judge Newman's orders, and between the dates of February 21, 2023 to March 21, 2023, it has intercepted wire and electronic communications between SMITH at 937-838-5454 and various individuals involving drug transactions as detailed below.

15.     Law enforcement has also conducted searches on open records and public record databases, has searched law enforcement databases, and has issued numerous administrative subpoenas to phone providers and utility companies, as well as grand jury subpoenas as described further below.

9

16.     Additionally, as described further below, law enforcement has also spoken with several sources of information, including confidential sources and cooperating defendants, and has reviewed past investigations in which SMITH and other DTO members have been associated. Law enforcement has used some of those sources in conducting controlled purchases from BURNS and SMITH.

17.     As discussed in more detail below, the investigation shows that SMITH has been a large-scale cocaine trafficker for many years.   He utilizes a warehouse (Target Location 6) as part of his drug trafficking and has allowed BURNS to use it as well.   SMITH primarily resides at Target Location 1 and frequently travels to Target Location 2, Target Location 3, and Target Location 4.   Based upon surveillance done during the investigation, SMITH has been actively working on repairs on Target Location 4.   SMITH utilizes numerous vehicles including the Escalade, the flatbed tow truck, a yellow Corvette, and has access to numerous other vehicles. SMITH is part owner of at least three businesses known to investigators (Buckeye Red Ltd., Buckeye Invested LLC, and Buckeye Dirt LLC).   Buckeye Red[4] owns several residences to include Target Location 5.   SMITH has been working on rehabbing and renting several of these residences but also appears to be using these residences as stash houses and meeting spots for drug trafficking.   SMITH has sold cocaine to a cooperator and has been captured on the wiretap as engaging in drug trafficking.

---

4.  Buckeye Red Ltd., Buckeye Invested LLC, and Buckeye Dirt LLC are all registered with the State of Ohio. There is no registration for a Buckeye Red LLC. Based on the investigation, we believe SMITH uses Buckeye Red LLC interchangeably with the other business names.

18.     As discussed in more detail below, the investigation shows that BURNS has identified Target Location 12 as his personal residence and has utilized the warehouse (Target Location 6) for purposes of selling narcotics.   Law enforcement, using a cooperator, has conducted controlled purchases from BURNS at Target Location 13.

19.     As I describe in detail below, my investigation revealed a pattern of activity consistent with SMITH, BURNS, and others using the Target Locations in furtherance of their drug trafficking business.

### C.     Cooperator Information

20.     In February of 2022 and in April of 2022, a cooperating defendant (CD-1)[5] provided information to the DEA concerning BURNS.   CD-1 stated BURNS is selling kilogram quantities of fentanyl, cocaine and marijuana in the greater Dayton, Ohio area.   CD-1 stated BURNS uses Target Location 6 to sell and store his drugs.   CD-1 stated BURNS and SMITH are ████.   CD-1 stated CD-1 has first and secondhand information associated with BURNS and SMITH.   CD-1's information is current and ongoing throughout this investigation.   CD-1 stated SMITH owns Target Location 6, sells multiple kilograms of cocaine, and lives at Target Location 1.

---

5.   CD-1 has provided information in the past that has proven to be true and accurate through independent investigation. Based on this and information learned in the investigation, I believe that information provided by CD-1 is reliable.   CD-1 has a criminal history that includes convictions for conspiracy to distribute controlled substances and conspiracy to possess with intent to distribute narcotics.   CD-1 is cooperating for judicial consideration in a pending criminal case.

21.     In March of 2022, investigators learned from a second cooperating defendant (CD-2)[6] that BURNS sells and stores drugs at Target Location 6.

22.     In April of 2022, confidential source (CS-1)[7] stated BURNS is associated with Target Location 6.   CS-1 stated BURNS and SMITH were actively participating in drug trafficking.

23.     In April of 2022, a confidential source (CS-2)[8] stated BURNS was utilizing Target Location 6 to store drugs and that CS-2 observed the drugs in plain sight approximately five (5) years ago at Target Location 6.   CS-2 stated SMITH resides at Target Location 1 and that SMITH is supplied ten (10) or more kilograms of cocaine from an unknown source in Texas.   CS-2 stated SMITH has owned Target Location 6 for over ten (10) years.   CS-2 stated SMITH has been selling drugs since the 1990's.   CS-2 stated SMITH's main source of supply is cocaine.   In December

---

6.   CD-2 has provided information in the past that has proven to be true and accurate through independent investigation. Based on this and information learned in the investigation, I believe that information provided by CD-2 is reliable. CD-2 has a criminal history that includes convictions for possession of controlled substances and aggravated robbery.   CD-2 is cooperating for judicial consideration in a pending criminal case.

7.   CS-1 has provided information in the past that has been proven to be true and accurate through independent investigation and led to the issuance of search warrants and the recovery of illegal drugs, money, and weapons.   Based on this and information learned in the investigation, I believe that information provided by CS-1 is reliable.   CS-1 has a criminal history that includes convictions for engaging in a pattern of corrupt activity, trafficking in drugs, conspiracy to traffic cocaine, possession of criminal tools, and OVI.   CS-1 provided this information on a voluntary basis in hopes of a monetary reward.

8.   CS-2 has provided information in the past that has been proven to be true and accurate through independent investigation and led to the issuance of search warrants and the recovery of illegal drugs, money, and weapons. Based on this and information learned in the investigation, I believe that information provided by CS-2 is reliable.   CS-2 has a criminal history that includes convictions for receiving stolen property, felony theft, carrying a concealed weapon, trafficking in drugs, and tampering with evidence.   CS-2 provided this information on a voluntary basis in hopes of a monetary reward.

of 2022, CS-2 advised SMITH commonly stores and breaks down his cocaine in abandoned houses that SMITH is affiliated with and/or owns.

24.     In June of 2022, a confidential source (CS-3)[9] stated BURNS is selling fentanyl, cocaine, and methamphetamine.   CS-3 stated BURNS presses drugs and CS-3 has seen drugs at Target Location 13.   CS-3 stated SMITH owns Target Location 6.   CS-3 stated in approximately 2020, CS-3 observed multiple blenders being used to mix up drugs at Target Location 6 by BURNS.   CS-3 stated SMITH receives large shipments of drugs and sells the shipments quickly. CS-3 stated SMITH provides BURNS with a portion of the shipment of drugs.

### III.

### PROBABLE CAUSE FOR TARGET LOCATIONS

#### A.     Target Location 1: 2030 Aspen Ridge Ct., Miami Township, Ohio

25.     Based upon information learned during the course of this investigation, investigators believe Target Location 1 to be the main residence of Thomas SMITH. Investigators have observed SMITH coming and going from the residence on multiple occasions, the latest of which occurred in March 2023.

---

9.  At the time that DEA spoke with this individual in June of 2022, he/she was a source of information.   This individual subsequently became a confidential informant. Thus, he/she is being referred to as a confidential source (CS-3) for purposes of identity in this Affidavit.   CS-3 has provided information in the past that has been proven to be true and accurate through independent investigation and led to the issuance of search warrants and the recovery of illegal drugs, money, and weapons. Based on this and information learned in the investigation, I believe that information provided by CS-3 is reliable.   CS-3 provided this information on a voluntary basis in hopes of monetary reward.   CS-3 has a criminal history that includes convictions for involuntary manslaughter, having weapons while under disability, possession with intent to distribute and felon in possession of a firearm.

26.     In March 2023, investigators conducted an open record check of the property, and learned that Target Location 1 is owned by SMITH, and has been owned by SMITH since 2004. Also in March 2023, investigators conducted a utility check of the residence, and determined the AES utilities are listed in the name of ▬▬▬▬. It is unknown to investigators who ▬▬▬ is or her connection to SMITH.  However, investigators intercepted a phone call via the court authorized wiretap of SMITH's phone in which SMITH paid the electric bill to Target Location 1 over the telephone.

27.     As noted above, investigators obtained multiple search warrants allowing for installation of GPS devices on multiple vehicles utilized by SMITH, including a white Cadillac Escalade and a GMC flatbed tow truck. GPS data from the vehicles frequently placed the vehicles at this residence, including almost every night during late evening hours to early morning, consistent with the time SMITH is likely asleep. In addition, investigators installed the GPS devices on the vehicles at Target Location 1 on multiple occasions. Furthermore, investigators observed a yellow Corvette with Indiana temporary license plate R514303 parked at the residence on multiple occasions. As discussed further below, investigators have observed SMITH driving the Corvette on multiple occasions, including to and from drug transactions.

28.     During the course of this investigation, investigators obtained multiple search warrants authorizing the interception of ping geolocation data for SMITH's telephone. The ping geolocation data commonly pinged within the radius of Target Location 1, including during overnight hours consistent with the time SMITH would be asleep.

29.     In January 2023, investigators intercepted multiple phone calls between SMITH and a person believed to be Marvin WEAVER[10] (hereinafter referred to as WEAVER). Based upon my training and experience, the context of the conversation, and information learned throughout the course of this investigation, I believe that WEAVER, using coded language, requested to obtain "two" of an unknown drug from SMITH, and SMITH agreed to deliver the drugs to WEAVER. Investigators conducted surveillance of SMITH contemporaneous with the intercepted calls. Investigators believed SMITH to be at Target Location 1 based on ping geolocation data.   Investigators continued to monitor ping geolocation data.   The ping geolocation data began pinging outside the radius of Target Location.   Investigators established surveillance and observed SMITH's yellow Corvette parked in front of Target Location 2 and 3 then leave the area and drive to WEAVER's residence (Target Location 7). Investigators observed SMITH's yellow Corvette parked outside WEAVER's residence for multiple hours. Investigators then observed SMITH drive back to Target Location 1 in his yellow Corvette. Based upon my training and experience and the actions observed by investigators, I believe a drug transaction occurred between SMITH and WEAVER, and SMITH returned directly to Target Location 1 with the proceeds from the drug transaction.

30.     In March 2023, investigators conducted a controlled purchase operation in which a confidential source purchased an amount of suspected cocaine from SMITH. CD-1 contacted SMITH via telephone and, using coded language, requested to purchase an amount of cocaine.

---

10. During the course of the investigation, law enforcement developed information that has now led investigators to believe that one of the phone numbers intercepted on the wire is in fact Marvin WEAVER. WEAVER had been identified in previous warrants as UM 4908.   In researching WEAVER, law enforcement found information suggesting that Marvin WEAVER is also known as Marvin WEAVER, Jr.   However, his driver's license identifies him as Marvin WEAVER and will be referred to as such throughout this warrant.

SMITH agreed and told CD-1 to meet SMITH at Target Location 2. Shortly thereafter, investigators observed the drug transaction between SMITH and CD-1 in which CD-1 obtained an amount of suspected cocaine from SMITH outside Target Locations 2 and 3. CD-1 paid SMITH for the purported cocaine. Immediately following the transaction, investigators observed SMITH drive from the deal back to his residence at Target Location 1. Based upon my training and experience and the actions observed by investigators, I believe SMITH returned directly to Target Location 1 with the proceeds from the drug transaction with CD-1.

31.     In addition, investigators observed SMITH, either via physical surveillance, GPS surveillance, and/or ping geolocation data, either leaving from and/or returning to Target Location 1 in correlation with what investigators believe to be drug trafficking activities on multiple other occasions, some of which are further discussed below.

32.     Based upon my training and experience, I know that drug traffickers commonly keep an amount of drugs at their residences, as well as drug proceeds, vehicles used in the facilitation of drug transactions, assets, ledgers, and items related to drug trafficking, including cell phones.

**B.     Target Locations 2 and 3:** ███████████████████████, and ████.

33.     Based upon information learned during the course of this investigation, investigators believe Target Locations 2 and 3 to be stash houses utilized by SMITH and SMITH DTO members to store drugs and drug proceeds, and to traffic drugs from.

34.     In March 2023, investigators conducted an open source check of Target Location 2 and determined that it was owned by ████████████ and has been since 2005. To date, investigators are unaware of the connection between SMITH and ████████████ Likewise, investigators conducted a utility check in March 2023 and determined the utilities are listed in the

16

name of ███████████ (hereinafter referred to as ███████ Investigators believe █.

████ to be the ████ of SMITH, and have observed vehicles registered to ███████ parked at

Target Location 2 on multiple occasions. Based upon information obtained during the course of

this investigation, investigators believe ███████ lives at Target Location 2.

35.     In March 2023, investigators conducted an open source check of Target Location

3 and determined that it was owned by ███████, and has been since 2020. Throughout the

course of this investigation, investigators have learned that ███████ is a close associate of

SMITH's, and in fact, investigators believe ███████ to be the paramour of SMITH.

Investigators believe that SMITH and ███████ possibly have a ███ or ███████

together. Through intercepted calls, investigators learned that SMITH speaks frequently to ███████

███, almost every day, usually multiple times a day. Based upon intercepted calls as well as

open-source database checks, investigators believe ███████ resides in Texas, and not in the

Dayton area.

36.     Investigators conducted a utility check in March 2023 and determined that there is

no active electric utility service to Target Location 3. Other than observing SMITH at Target

Location 3, as discussed below, investigators have not observed anyone at the residence during

the course of this investigation, and believe the residence to be vacant.

37.     Target Locations 2 and 3 are located right next to each other on the west side of

███████. There is an alley that runs directly behind both locations, in which vehicles

can drive. Target Location 3 has a 6-foot privacy fence behind it with an opening that separates

it from the alley. Target Location 2 also has a small fence separating it from the alley. Individuals

can access Target Location 2 and Target Location 3 from the rear alley. Due to the location of the

residences in correlation to the alley and privacy fences, it is difficult for investigators to conduct surveillance of the rear of both Target Locations 2 and 3.

38.     During the course of the investigation of the SMITH DTO, investigators have observed SMITH on multiple occasions going to the area of Target Locations 2 and 3 just prior to conducting drug transactions. On almost every such occasion, SMITH stopped at the locations for only a few minutes. Based upon my training and experience, I believe SMITH's brief stops are consistent with picking up drugs from a stash house.

39.     For example, in January 2023, investigators conducted a controlled purchase operation in which a confidential source purchased an amount of suspected cocaine from SMITH. At the direction of investigators, CD-1 called SMITH and requested to purchase an amount of cocaine, and SMITH agreed to meet up shortly thereafter to conduct the drug transaction. On this particular occasion, investigators observed SMITH working on the vacant property at ███ ████ (Target Location 4). Investigators observed SMITH drive from Target Location 4 to the suspected stash houses at Target Locations 2 and 3. Investigators observed SMITH park his vehicle in the alley behind Target Locations 2 and 3 and then enter the backyard of either Target Location 2 or 3 through the gate of Target Location 2 or the opening in the fence of Target Location 3.   Due to privacy fences as well as nature of the alley, investigators were unable to see specifically which Target Location SMITH entered from the rear. A few minutes later, investigators observed SMITH return to his vehicle and drive back to Target Location 4. Shortly thereafter, CD-1 arrived and purchased an amount of suspected cocaine from SMITH.

40.     Based upon my training and experience, as well as the actions of SMITH during the January 2023 controlled purchase operation, I believe SMITH drove to Target Locations 2 and/or 3 to obtain the suspected cocaine purchased by CD-1.

41.     On January 11, 2023, investigators intercepted multiple telephone calls between SMITH and KISNER. During the phone calls, KISNER requested to obtain one "filter" from SMITH. Investigators believed that SMITH and KISNER utilized coded language to arrange a drug transaction. The two agreed to meet up that day. Investigators conducted surveillance of SMITH and KISNER contemporaneous with the intercepted calls. Prior to the meet up, investigators observed SMITH drive to Target Locations 2 and 3 and again park in the rear of the residences, specifically in the alley.   Investigators then observed SMITH enter the backyard of either Target Locations 2 and 3 through the gate of Target Location 2 or the opening in the fence of Target Location 3. Due to privacy fences as well as nature of the alley, investigators were unable to observe which Target Location SMITH entered, and subsequently whether SMITH entered Target Location 2, 3, or both. A few minutes later, investigators observed SMITH return to his vehicle and drive away from the area. Investigators observed SMITH and KISNER meet up at a car wash located near Needmore Road. Investigators observed SMITH and KISNER park directly next to each other in the parking lot, so that the driver's doors were directly next to each other. Investigators then observed SMITH open the door to SMITH's vehicle, lean into KISNER's vehicle through KISNER's driver's side window such that SMITH's hands and torso were not visible, and then quickly return to SMITH's vehicle. Based upon my training and experience, I believe SMITH's actions were consistent with a hand-to-hand drug transaction. Both KISNER and SMITH then departed from the area, with SMITH ultimately returning to his residence at Target Location 1, and KISNER driving to ███████████ 's (hereinafter referred to as ████████) residence at Target Location 9.

42.     Investigators have observed SMITH on other occasions stop at Target Locations 2 and 3 briefly before suspected drug transactions. In March 2023, investigators intercepted phone

19

calls between SMITH, KISNER, and ███████, in which KISNER arranged for ███████ to pick up an amount of suspected drugs on KISNER's behalf, to which KISNER would pay for on a later date.[11] Investigators again observed a vehicle matching the description of a vehicle associated with SMITH in the alley behind Target Locations 2 and 3, and then observed SMITH meet up with ███████ to conduct the suspected drug transaction. Also in March 2023, investigators conducted a controlled purchase operation in which CD-1 purchased an amount of suspected cocaine from SMITH. On this occasion, SMITH told CD-1 to meet SMITH at "his ███'s house" at ███████ to conduct the transaction (Target Location 2). Investigators observed CD-1 arrive outside Target Locations 2 and 3. Investigators then observed SMITH parked in the driveway of Target Location 3.   SMITH conducted the drug transaction with CD-1 while in SMITH's vehicle in the driveway of Target Location 3.

43.     On March 9-10 2023, investigators intercepted multiple calls between SMITH and an unknown male (UM 2233), in which the two utilized coded language to arrange a drug transaction. Based upon training and experience, as well as the context of the conversation, investigators believe UM 2233 requested to purchase one ounce of cocaine from SMITH for $800. Based upon my training and experience, I know that one ounce of cocaine is indicative of an amount of drugs purchased for resale as opposed to personal use.[12] Based upon the conversation, investigators believe UM 2233 has purchased drugs from SMITH in the past on multiple occasions, and that UM 2233 owed money to SMITH incurred as a result of past drug transactions in which SMITH fronted UM 2233 drugs.

---

11.   Additional details regarding the March 2023 transaction with ███████ are set forth below.
12. Based on my training and experience, I know one ounce to be a distribution amount of cocaine. One ounce of cocaine is equivalent to approximately 25-28 doses for personal use. For an addict with a high tolerance of approximately 1 gram a day, 1 ounce of cocaine would still be equivalent to a month's supply.

44. On March 10, 2023, during one of the intercepted calls between UM 2233 and SMTH, SMITH stated that he would let UM 2233 know "as soon as I get everything together…," that SMITH was "waiting for him to get up," and that SMTH was over on the "west." Based upon my training and experience, the context of the conversation, and information learned throughout the course of the investigation, I believe SMITH was communicating to UM 2233 that SMITH needed to pick up the drugs first, that SMITH was on the west side of Dayton, in the vicinity of Westwood, and that SMITH was waiting on his [redacted] to wake up before obtaining the drugs.

45. Investigators conducted surveillance of SMITH contemporaneous with the phone calls between SMITH and UM 2233 on March 10, 2023. That morning, investigators observed SMITH arrive at Target Locations 2 and 3. SMITH parked his vehicle in front of Target Locations 2 and 3, and then went inside Target Location 2 via the front door. A short while later, investigators observed SMITH exit Target Location 2 and walk down the driveway of Target Location 3 towards a door on the side of the residence of Target Location 3. SMITH remained inside Target Location 3 for just a few minutes, then exited Target Location 3 via the side door. Investigators observed SMITH shut the door behind him, and then walk back into Target Location 2 via the front door. Shortly thereafter, SMITH got in his vehicle and drove away from the area. Investigators maintained surveillance of SMITH throughout the day and observed SMITH meet with UM 2233 outside Target Location 5 to conduct a suspected drug transaction.

46. In December 2022, CS-2 told investigators that SMITH commonly utilizes vacant houses in order to store his drugs. CS-2 advised that SMITH uses vacant houses that SMITH is associated with as well as vacant houses that are not associated with SMITH to store, cut, and package his drugs. CS-2 advised that SMITH has done so for many years.

47.     Based upon my training and experience, I know that drug traffickers typically do not store large quantities of drugs at their residences, but instead utilize stash houses in order to store their larger supply of drugs. Drug traffickers frequently place properties and/or utilities in the names of other individuals in order to evade law enforcement and prevent law enforcement from identifying and tying properties to the drug traffickers.

48.     Investigators know that Target Location 3 has not had active utility service since 2019, and that the property is owned by SMITH's paramour, ███████. Investigators believe that ███████ resides in Texas and that Target Location 3 is vacant. Investigators believe █ ████, SMITH's ███, resides at Target Location 2, and is able to keep watch over SMITH's main stash of narcotics. Furthermore, SMITH's actions of stopping briefly at Target Locations 2 and 3 just prior to drug transactions is indicative of a stash location. Based upon all the above, as well as my training and experience, I believe that SMITH and SMITH DTO members utilize Target Locations 2 and 3 in order to store drugs and to package the drugs for buyers, and thus other evidence of drug trafficking will be present in addition to narcotics.

C.     **Target Location 4:** ███████████████

49.     Based upon information learned during the course of this investigation, investigators believe Target Location 4 to be a vacant residence that SMITH utilizes to facilitate his drug trafficking.   As discussed below, SMITH has used Target Location 4 for buys with CD-1, WEAVER, and ███████████[13] (hereinafter referred to as ███████████).

---

13. Investigators have developed information over the course of the investigation that has caused them to believe that ███████████ is the person associated with ███████, which was intercepted on the wire. ███████████ has been referred to in previous warrants as UM 0032.   Based on the identification, he will be referred to as ███████████ in this affidavit.

50.     Investigators conducted an open source database check in March 2023 and determined that Target Location 4 is owned by SMITH, and has been since 2005. In addition, investigators conducted a utility check in March 2023 and determined that Target Location 4 has not had active electric service since 2021. During the course of this investigation, investigators have not observed anyone living at Target Location 4 and believe it is vacant. Investigators have observed SMITH at Target Location 4 on multiple occasions doing what appeared to be construction/remodeling work on the house. Investigators have also intercepted multiple calls between SMITH and other individuals in which SMITH discusses his work actively remodeling Target Location 4.

51.     Throughout the course of this investigation, investigators have conducted multiple controlled purchase operations in which a confidential source has purchased suspected narcotics from SMITH at Target Location 4, the latest of which occurred in January 2023.

52.     As set forth above, in January 2023, investigators conducted a controlled purchase operation in which a confidential source purchased an amount of suspected cocaine from SMITH. On this particular occasion, investigators observed SMITH working on the vacant property at ▮▮▮▮▮▮ (Target Location 4). At the direction of investigators, CD-1 called SMITH and requested to purchase an amount of cocaine, and SMITH agreed to meet up shortly thereafter to conduct the drug transaction. SMITH told CD-1 to meet SMITH at Target Location 4 in order to conduct the transaction. Investigators then observed SMITH drive from Target Location 4 to the suspected stash houses at Target Locations 2 and 3. A few minutes later, investigators observed SMITH drive back to Target Location 4. Shortly thereafter, CD-1 arrived and purchased an amount of suspected cocaine from SMITH.

23

53.     On January 1, 2023, investigators intercepted multiple phone calls between SMITH, WEAVER, and ████████████, in which the three used coded language to arrange a drug transaction. Over the series of multiple conversations across multiple phone calls, ████████████ requested to purchase first three, then four "hard boiled eggs" from SMITH. SMITH told ████████████ that SMITH's partner would bring the requested "eggs." ████████████ asked SMITH if SMITH's partner was "legit," and SMITH replied that it was SMITH's product. SMITH then called WEAVER and informed WEAVER that SMITH had a "play" for him. SMITH requested WEAVER bring the product to SMITH at "████." During a subsequent phone call, ████████████ requested four "hard boiled eggs." SMITH then spoke to WEAVER and requested WEAVER bring "four," to which WEAVER clarified if SMITH meant four "g." Investigators later intercepted a call in which ████████████ told SMITH that ████████████ was at Target Location 4, and that he thought SMITH's "dude" WEAVER had arrived as well. SMITH told ████████████ to come upstairs. SMITH later called WEAVER and clarified that ████████████ purchased "four" for "160."

54.     Based upon my training and experience, as well as the context of the conversation, I believe ████████████ requested to purchase four grams of crack cocaine from SMITH. SMITH then contacted WEAVER to source the deal, and assured ████████████ the narcotics were quality because SMITH sold them to WEAVER. I believe ████████████ and WEAVER then met SMITH at Target Location 4 to conduct the transaction, in which ████████████ purchased four grams of crack cocaine for $160.

55.     As noted above, CS-2 told investigators that SMITH commonly utilizes vacant houses in order to store his drugs. CS-2 advised that SMITH uses vacant houses that SMITH is

24

associated with as well as vacant houses that are not associated with SMITH to store, cut, and package his drugs. CS-2 advised that SMITH has done so for many years.

**D.** **Target Location 5:** ███████████████████

56. Based upon information learned during the course of this investigation, investigators believe Target Location 5 to be a vacant residence that SMITH utilizes to facilitate his drug trafficking business.

57. Investigators conducted an open source database check in March 2023 and determined that Target Location 5 is owned by Buckeye Red, LLC, and has been since 2015. Investigators know Buckeye Red Ltd. to be one of multiple businesses owned by SMITH, and believe the business is utilized in part to launder drug proceeds. In addition, investigators conducted a utilities check in March 2023 and determined that the electric utilities for Target Location 5 are listed in the name of ████████. Investigators are unsure of the connection between SMITH and ████ at this point in time. Throughout the course of this investigation, investigators believe that Target Location 5 has been mostly vacant. Based upon an intercepted call on the wiretap, investigators believe that an unknown person was living in Target Location 5 for a short time but has since moved out. Investigators believe Target Location 5 is currently vacant. Investigators have intercepted multiple calls between SMITH and other individuals in which SMITH discusses trying to rent Target Location 5.

58. On March 10, 2023, investigators observed two suspected drug transactions between SMITH and two individuals at Target Location 5: one between SMITH and UM 2233, and one between SMITH and ████████.

59. On March 10, 2023, investigators intercepted multiple phone calls between SMITH and ████████ During one of the calls, ████████ told SMITH that he liked

25

SMITH's "McDonald's," and didn't "really like anyone else's McDonald's." Based upon training and experience, as well as the context of the conversation, investigators believe SMITH and ███████████ used coded language to arrange a drug transaction. SMITH agreed to meet with ███████████ later that afternoon. That afternoon, investigators intercepted another call during which SMITH directed ███████████ to meet SMITH at Target Location 5. Investigators observed SMITH arrive at Target Location 5. A short while later, investigators observed ███████████ arrive at Target Location 5 driving a vehicle registered to ███████████ Investigators saw ███████████ walk towards the front of the residence to meet with SMITH. Based upon my training and experience, as well as the conversations intercepted between SMITH and ███████████, I believe a drug transaction then took place at Target Location 5.

60. On March 9-10, 2023, investigators intercepted multiple phone calls between SMITH and UM 2233. Based upon training and experience, as well as the context of the conversation, investigators believe UM 2233 requested to purchase one ounce of cocaine from SMITH for $800. Based upon the conversation, investigators believe UM 2233 has purchased drugs from SMITH in the past on multiple occasions, and that UM 2233 owed money to SMITH as a result of past drug transactions in which SMITH fronted UM 2233 drugs.

61. Investigators conducted surveillance of SMITH contemporaneous with the phone calls between SMITH and UM 2233 on March 10, 2023. That morning, investigators observed SMITH stop briefly at the suspected stash houses at Target Locations 2 and 3. Investigators maintained surveillance of SMITH throughout the day. Later that day, investigators intercepted a call between SMITH and UM 2233 in which SMITH directed UM 2233 to Target Location 5 in order to conduct the drug transaction. Investigators intercepted another call during which UM 2233 alerted SMITH that UM 2233 had arrived at Target Location 5, and that UM 2233 was in a

black SS. Investigators observed a black Chevrolet Impala SS edition arrive at Target Location 5 and park on the street in front of Target Location 5. Investigators then observed SMITH exit Target Location 5, enter the passenger's seat of the Impala for a few minutes, exit the Impala, and then leave the area in the flatbed tow truck . Investigators followed UM 2233 has he drove away from the area and back to Target Location 11.

62.     Based upon my training and experience, as well as the context of the intercepted telephone communications, I believe SMITH and UM 2233's actions were consistent with a drug transaction, and that a drug transaction occurred between the two at Target Location 5.

63.     As noted above, CS-2 told investigators that SMITH commonly utilizes vacant houses in order to store his drugs. CS-2 advised that SMITH uses vacant houses that SMITH is associated with as well as vacant houses that are not associated with SMITH to store, cut, and package his drugs.   CS-2 advised that SMITH has done so for many years.

### E.     Target Location 6: 2412 N. Gettysburg Ave., Dayton, Ohio

64.     Based upon information learned during the course of this investigation, investigators believe Target Location 6 to be a warehouse that SMITH utilizes to primarily store assets, as well as evidence of money laundering and DTO drug trafficking activities.

65.     Based on information learned throughout the course of this investigation, investigators believe SMITH is the purported owner of Target Location 6. Investigators know that Target Location 6 consists of four buildings. There is a large, multi-floor building described as a former industrial warehouse, located directly east of Gettysburg Avenue. The main building was previously a bottling warehouse that housed the Siegler Bottling Company, but has not operated as such for many years. The main building has an industrial loading dock on the south side of the building. Investigators believe the inside of the main warehouse consists of open spaces

as well as storage areas. The main building contains a large amount of storage space such that one would be able to store multiple vehicles inside of it. Behind the main building, there are three smaller outbuildings, each appearing to be industrial in nature. Target Location 6 is surrounded by a tall chain link fence. There are two gates to the property. Based on source information, investigators believe SMITH rents a portion of Target Location 6 to individuals as storage space, as well as space to work on vehicles.

66.     Throughout the course of the investigation, investigators observed SMITH accessing Target Location 6 on multiple occasions, including multiple times late at night. On some of these occasions, investigators observed SMITH meet with individuals, both during daytime hours and late at night, at Target Location 6, and escort such individuals either onto the property through the gate, and/or into the main building of Target Location 6.

67.     To be clear, investigators have observed SMITH access the property through the chain link fence. Investigators have also observed SMITH go in and out of the main building. Due to layout of the property as well as the limitations of the pole camera and surveillance viewpoints, investigators have not observed SMITH enter any of the three outbuildings located behind the main building, and are unaware of whether these outbuildings are separately rented to other individuals, and/or separately secured. Due to the layout of the property, as well as the fence surrounding the property, investigators are unable to determine SMITH's access to any outbuildings.

68.     Investigators intercepted multiple calls throughout the course of this investigation in which SMITH claimed he was the owner of Target Location 6. SMITH has represented himself as the owner of Target Location 6 to law enforcement as well. Investigators learned that in the summer of 2021, the Dayton Police Department received a complaint of vandalism at Target

28

Location 6. SMITH arrived at Target Location 6 to speak with officers about the vandalism. SMITH identified himself and stated he owned Buckeye Red LTD. Additionally, investigators located an information only fraud report filed with the Dayton Police Department in the summer of 2022 regarding Target Location 6. SMITH called police and stated that an ex-coworker had created an account for utilities using SMITH's identifiers. SMITH told police that he rents out spaces at Target Location 6.

69.     In March 2023, investigators conducted an open source database search and learned that Target Location 6 is owned by ▇▇▇▇▇▇▇ and has been since 2012. Investigators also conducted a utility records check of Target Location 6 in March 2023 and determined that the commercial account for the electric service is also in the name of ▇▇▇▇▇ ▇▇▇▇. The electric service for Unit B is listed in the name of ▇▇▇▇▇▇▇ Investigators believe ▇▇▇▇▇▇▇ is a ▇▇▇ of SMITH's, but to date, have been unable to confirm that. Investigators are unaware of any connection between ▇▇▇▇▇▇▇ and SMITH in regards to illicit activities.

70.     In February 2023, investigators intercepted a from call from SMITH to AES electric company. During the call, SMITH paid the electric bill for Target Location 6. When doing so, SMITH represented to the electric company that he was in fact ▇▇▇▇▇▇▇.

71.     Through a search of open source databases, investigators found multiple businesses that SMITH owns and/or is a member of that are affiliated with Target Location 6. Investigators reviewed the articles of organization filed with the Ohio Secretary of State for SMITH's business Buckeye Dirt LLC, which was filed in April 2017. The business lists the receipt address as 2412 N. Gettysburg Ave, Dayton, Ohio, the same address as Target Location 6. Furthermore, SMITH is listed as the statutory agent for the business, and again lists the service

29

of process address as Target Location 6. The articles of organization are also signed by SMITH. Investigators also discovered an article of organization for Buckeye Invested LLC, another business believed to be owned by SMITH. Formed in January 2020, SMITH is again listed at the statutory agent and signed the articles of organization for the company. The mailing address is listed as 2412 Gettysburg Ave, Suite 3, Dayton, Ohio, which is located at Target Location 6.

72.    During the course of this investigation, investigators discovered that SMITH obtained approximately $378,500 in Covid-19 Economic Injury Disaster Loans (EIDL). EIDL loans were issued by the Small Business Administration (SBA) to businesses in response to the Covid-19 pandemic, and the use of the funds was restricted to business related purposes.[14] To date, investigators are still waiting on confirmation of the full amount of SMITH's loan, but have confirmed the existence of a portion of this amount. Investigators learned that SMITH applied for an EIDL loan in July 2020 in the name of his business, Buckeye Red Ltd. On the application, SMITH provided his phone number, ███████, the same number upon which investigators received a TIII wire intercept. Investigators obtained SMITH's bank records through a grand jury subpoena and were able to confirm that SMITH received a deposit of $124,900, deposited into SMITH's Buckeye Red LTD business account on August 4, 2020, from the SBA.

73.    During this investigation, investigators intercepted multiple calls in which SMITH discussed his use of SBA EIDL funds in improper ways. For example, on January 20, 2023, investigators intercepted a call between SMITH and an unknown female (UF), UF 0987. A transcript of the pertinent parts of the conversation is listed below:

**January 20, 2023, at approximately 5:21 p.m.**

---

14. From SBA's website, EIDL funds were permitted to be spent only on "Working capital to make regular payments for operating expenses, including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt incurred at any time (past, present, or future)."

**Incoming call from** ████-0987, UF 0987
**Session 8578**

| | |
|---|---|
| UF 0987: | Hello. |
| SMITH: | Yes ma'am. |
| UF 0987: | What's up. |
| SMITH: | Man so. |
| UF 0987: | Hello. |
| SMITH: | Yea. |
| UF 0987: | What's up. |
| SMITH: | Well um I kinda got some money right. |
| UF 0987: | Okay. |
| SMITH: | Um I kinda forgot I owed the people back.   And I don't know they kinda just called me and reminded me today. |
| UF 0987: | What people what are you talking about Thomas? |
| SMITH: | The SBA loan. |
| UF 0987: | What? |
| SMITH: | I thought it was forgivable. |

                    [LATER IN THE CALL]

| | |
|---|---|
| UF 0987: | How much money you get? |
| SMITH: | $390,000. |
| UF 0987: | What? |
| SMITH: | Matter of fact it was 370. |

                    [LATER IN THE CALL]

31

SMITH:          I haven't just blew the fucking money.   Right I bought fucking the two houses. Out of that money. I didn't blow the god damn money.   Hello hello hello,

UF 0987:        I'm here I'm here.   Can you hear me?

SMITH:          It was going in and out I don't know.   I then I mean you know I still got a couple pennies left I ain't exactly just even broke right now. But you know what I'm saying shit I paid taxes. Like I paid property taxes. Man, that's money I'm spending on the shit that's just gone. I paid taxes I pay the taxes on the building every month. Nigga that's money I'm spending on it. Yes I'm paying a band out there a month. Nigga that's been two years. That's what $24,000 right there. Nah it ain't it ain't like I just like I been [unintelligible] the money. Damn I bought the house in Fairborn with the anticipation of just reselling it making some short profit real quick. Nigga she it didn't go through. The house still sitting there. Man, I been paying property taxes on that motherfucker. Paid property taxes. Bought the house in Trotwood.   Man been spending I spent money in Trotwood.

UF 0987:        Hello

SMITH:          Yea

UF0987:         Wow well

SMITH:          I mean no nigga I ain't just god damnit blew the motherfucking money. [Unintelligible] you remember the Impalas I got. Man, that was with some of that money you feel me. I ain't piss it away but you know I ain't even gonna lie I thought I didn't have to start paying it until the second loan went through. I thought it was 30 months after the second one. No, it's 30 months after the first one.   I'm definitely nervous.

                              [LATER IN THE CALL]

SMITH:          And then I never sold the house in Fairborn. Man, you know. I never even sold the Trotwood house.

UF 0987:        That's the [unintelligible] the one that's why you got it for I thought you was getting it for your baby mama [unintelligible].

SMITH:          Yea right the one Trotwood the one in Fairborn.

UF 0987:        Yea.

SMITH:          That's yea I bought it and then I was only going to sell the house to her for 140. You know what I'm sayin just make. I paid 106 probably put about I

was probably going to put about $6,000, $7,000 in the house. Like not a lot you know just enough to clean it all up. And sell it to her for 140.

[LATER IN THE CALL]

SMITH:  I got six Impalas, I got the fucking a I got a Encore and a Enclave a Buick like like Jay's you know what I'm sayin I bought all them. I bought the fucking um well I did buy the truck but I don't know I did sell my truck though. That kind of evened that one out. That truck didn't never get fixed. And of course the fucking vette. That motherfucker that I got about a 100 about a $100,000 in that car.

[LATER IN THE CALL]

SMITH:  $1,900 that's a lot of bread ain't it.

UF 0987:  Yea yea.

SMITH:  That is a lot of motherfucking money.

UF 0987:  Yea for one bill. That's not that bad though. Damn I wish I had known it was just a 30-year loan like nigga I would of got that motherfucker too. Like nigga I would have had me a nice couple bedroom home shit.

SMITH:  How long a I know yea. How long did you thought it was for?

UF 0987:  Nigga I thought the shit was for businesses and man I wasn't about to play with it because I didn't want to go to jail.

SMITH:  And it was for businesses. I mean that's how I got it from my business.  I didn't I didn't do nothing fictitious.

UF 0987:  The loan was in your company name right?

SMITH:  Nah they put that motherfucker on both our names.  Yea it's in the company name but yea nigga they needed my name too.

UF 0987:  Oh okay.

74.     Based upon training and experience, conversational context clues, previous intercepted communications, and knowledge of the investigation, I believe SMITH purchased

33

multiple vehicles and properties with SBA EIDL funds and committed wire fraud.15 I believe SMITH is utilizing Target Location 6 to store the majority of these assets. Throughout the course of the investigation, investigators have observed SMITH arrive at Target Location 6 driving one vehicle and then later departing in a different vehicle, indicating that SMITH stores vehicles somewhere at Target Location 6. Furthermore, investigators have not located all vehicles owned by SMITH. For example, investigators have not located the multiple Chevrolet Impalas mentioned by SMITH during intercepted calls. Investigators have not observed these vehicles at other locations, and believe Target Location 6 is large enough to store multiple vehicles. Finally, investigators have intercepted multiple phone calls that indicated SMITH was working on vehicles at Target Location 6.

75.     On January 20, 2023, investigators intercepted a call between SMITH and UM 0450, in which SMITH again discusses his fraudulent use of SBA EIDL funds. A transcript of the pertinent parts of the conversation is listed below:

**January 20, 2023, at approximately 5:53 p.m.**
**Incoming call from** ███████**-0450, UM 0450**
**Session 8581**

SMITH:          Hello.

UM 0450:       All be damned.   I have been calling back the past few days.

[LATER IN THE CALL]

SMITH:          Oh Tom I'm in a bad situation.

---

15. Investigators believe that SMITH's businesses are not legitimate in that they have been funded by drug trafficking proceeds and are thus being used to launder money. However, even if the businesses were legitimate and even if the purchases of these additional properties could be considered proper purchases for the EIDL funds, SMITH's purchase of the yellow Corvette is not. As noted above, SMITH has been driving it for personal use and for conducting his drug trafficking business.

| UM 0450: | What's going on? |
|---|---|
| SMITH: | I owe these people they money back. |
| UM 0450: | For what. |
| SMITH: | The SBA loan. |

<div align="center">[LATER IN THE CALL]</div>

| UM 0450: | Okay okay so god damn man I don't know how much playing you done did. You still sitting with some of the money right? |
|---|---|
| SMITH: | Um out of that particular money probably about 25. |

<div align="center">[LATER IN THE CALL]</div>

| SMITH: | Oh yea I mean nigga I bought the house in Fairborn.  I paid a $106,000 cash.  You know what I'm sayin.  I bought the house in Trotwood.  I paid $70,000 cash. |
|---|---|
| UM 0450: | Right right. |
| SMITH: | I bought I bought the Corvette I got about $19,000 in the Vette.  I paid $70,000 for the Vette.   The rest of it was just you know parts and labor. |
| UM 0450: | Right. |
| SMITH: | But yea that's about 90 90 a little bit over 90 probably like 95 93 94 something like that.   Nigga there go there go there go the money right there. Plus the little bit of money I got left yea. |

<div align="center">[LATER IN THE CALL]</div>

| SMITH: | I still got 6 Impalas that I bought. 6 of em, a Buick Enclave, a Buick Encore, another Buick Lacrosse a 2012 2010 or something like that. |
|---|---|

<div align="center">[END OF PERTINENT CONVERSATION]</div>

76.     Investigators intercepted another call between SMITH and UM 0450 on the same date, in which SMITH continues to discuss his fraudulent use of SBA EIDL funds. A transcript of the pertinent parts of the conversation is listed below:

<div align="center">35</div>

**January 20, 2023, at approximately 6:01 p.m.**
**Incoming call from ███████-0450, UM 0450**
**Session 8582**

UM 0450:     Hello.

SMITH:       Um huh.   Yea shit I bought the claw truck.   That that ain't even the money I fixed up out the claw truck.   Buying the claw truck I spent like 27 and I bought it.

[LATER IN THE CALL]

SMITH:       And then I got you know it's been you know the other end just wasn't god damnit been like a motherfucking ninja turtle.   But it is what it is.

UM 0450:     Who you telling.

SMITH:       No nigga if I told you you would laugh at me.

UM 0450:     Okay see who is worse.   It don't take a month for god damnit 4 do it?

SMITH:       Nigga I bought this motherfucker in July.   Nigga I'm about to start on it.

UM 0450:     Right.

SMITH:       From July.   No no nigga yea it's a lot it's it's real bad.

UM 0450:     You know what.   But see I the thing I wouldn't even be worried about it. But listen is this one of those times I don't know where this patience come from.   Let me have about 10 of em and let it get fucked up.   It's going to be like a one hitter quitter baby I got it.

SMITH:       But you know what though and that's another thing I just been kinda on the relaxed side you feel me.   I ain't been out there stomping and stomping and stomping but it's just like you know but it's just like I ain't been sitting idle either.   I been doing shit you feel me.

UM 0450:     Right

SMITH:       It may not just been everything ain't simply worked out but you know I ain't [unintelligible] nigga I was about to buy a Bentley truck today and I'm happy I didn't buy it.

[LATER IN THE CALL]

36

SMITH: So right nigga like I said the one way it's just it's so motherfucking slow on that side. So I I might just take 10 off of that. And you know bam and like I said I got about 25 so that would be about 30. I wouldn't use the whole 10. Maybe take 5 5 and 25. I don't know. Come up with about 30 grand.

[END OF PERTINENT CONVERSATION]

77. Throughout the course of this investigation, investigators determined that SMITH purchased a residence in Fairborn, and investigators have seen SMITH driving a Corvette. Based upon training and experience, conversational context clues, previous intercepted communications, and knowledge of the investigation, I believe that SMITH committed wire fraud and purchased multiple vehicles, properties, and other assets with SBSA EIDL funds. Furthermore, investigators suspect that SMITH may have utilized EIDL funds to purchase narcotics. I believe that when SMITH referenced "the other end," that he "bought this motherfucker in July" and that he "is about to start on it," SMITH was referring to drug trafficking, that he purchased an amount of drugs in July, and that he is about to start selling the drugs. I believe that when SMITH stated he was not stomping but not sitting idle either, he meant that he (SMITH) was not aggressively selling drugs, but has not stopped selling drugs entirely either. As stated above, I believe SMITH is utilizing Target Location 6 to store assets improperly purchased with SBA EIDL funds, as well as drug proceeds.

78. Throughout the course of this investigation, investigators have received information from multiple sources stating that SMITH and SMITH DTO members use Target Location 6 for drug trafficking activities. CD-1 stated that in the summer of 2020, CD-1 was at Target Location 6 meeting with SMITH. CD-1 observed BURNS arrive at Target Location 6 and conduct drug transactions in the parking lot. CD-1 also acknowledged that BURNS utilized Target Location 6 to store drugs. CS-3 stated that CS-3 was aware that BURNS utilized Target Location

6 to store and traffic drugs, and did so for multiple years, until at least 2022. CS-3 stated CS-3 observed BURNS's drug trafficking activity at Target Location 6 in person in 2021. CS-3 stated CS-3 was at Target Location 6 and observed BURNS processing drugs. CS-3 stated BURNS observed multiple blenders that BURNS was using to cut, mix, and process drugs. CS-3 stated BURNS has since moved BURNS's drug trafficking activity to Target Location 13, set forth in more detail below.

79.     On April 20, 2020, during a separate investigation, investigators acting in an undercover capacity as money couriers received a series of phone calls from ███████████.[16] During the calls, ███████ set up a meeting for the purpose of money laundering. During the meeting, ███████ conducted a money drop of $200,000 in plastic bags all in $20.00 denominations to investigators acting in an undercover capacity as money couriers. Investigators conducted surveillance on ███████'s vehicle after the money drop.  Investigators followed ███████ to Covington, Ohio, where investigators observed SMITH exit a business and enter ███████'s vehicle.  Law enforcement conducted a traffic stop of ███████'s vehicle and identified the three occupants as ███████, SMITH, and a woman unrelated to the investigation. After the traffic stop, investigators observed ███████ and SMITH drive to Target Location 6.

80.     Throughout the course of this investigation, investigators have observed SMITH driving multiple vehicles, including a Cadillac Escalade, a GMC flatbed tow truck, a yellow Chevrolet Corvette, a black Chevrolet Avalanche, and a black Chevrolet Silverado. In addition, investigators have intercepted phone calls of SMITH in which SMITH describes other vehicles

_____

[16]. On March 25, 2021, ███████ was charged with conspiracy to distribute cocaine.  On July 20, 2021, ███████ entered a plea of guilty in the United States District Court for the Southern District of Ohio Case Number 3:21cr00031 to possession with intent to distribute 500 grams or more of cocaine.  ███████ is now incarcerated serving his prison sentence on that case.

that SMITH owns, including multiple high value vehicles, including a Porsche, a Bentley, and multiple Chevrolet Impalas. To date, investigators have not been able to locate all of the vehicles that SMITH has described, and believe that SMITH owns multiple other vehicles not yet discovered by law enforcement. On some occasions when investigators have been conducting surveillance of SMITH, investigators have observed SMITH drive to Target Location 6 in one vehicle, and then depart from Target Location 6 driving another vehicle. As stated above, I believe that SMITH is utilizing Target Location 6 to store multiple vehicles and assets derived from drug trafficking and/or wire fraud.

  F.  **Target Location 7:** ████████████████

 81. Based upon information learned during the course of this investigation, investigators believe Target Location 7 to be a residence utilized by WEAVER to store and traffic drugs.

 82. Investigators conducted an open source database check in March 2023, and learned that Target Location 7 is owned by Marvin WEAVER Jr., and has been since 2022. Likewise, investigators checked the utilities for Target Location 7 in March 2023, and learned that electric utilities are listed in the name of Marvin D WEAVER Jr.

 83. As discussed above, investigators intercepted multiple phone calls between SMITH and WEAVER on January 1, 2023. I believe the two arranged a drug transaction in which WEAVER, through SMITH, sold four grams of crack cocaine to ███████ for $160.

 84. On January 15, 2023, investigators intercepted multiple phone calls between SMITH and WEAVER. Based on my training and experience, the context of the conversation, and information learned throughout the course of this investigation, I believe that WEAVER, using coded language, requested to obtain "two" of an unknown drug from SMITH. WEAVER

told SMITH that WEAVER was at "███," and SMITH agreed to deliver the drugs to WEAVER at Target Location 7. Investigators conducted surveillance of SMITH contemporaneous with the intercepted calls. Investigators believed SMITH to be at Target Location 1 based on ping geolocation data. Investigators continued to monitor ping geolocation data. The ping geolocation data began pinging outside the radius of Target Location 1. Investigators established surveillance and observed SMITH's yellow Corvette parked in front of Target Locations 2 and 3 then leave the area and drive to WEAVER's residence at Target Location 7. Investigators observed SMITH's yellow Corvette parked outside WEAVER's residence for multiple hours. Investigators then observed SMITH drive back to Target Location 1 in his yellow Corvette. Based upon my training and experience and the actions observed by investigators, I believe a drug transaction occurred between SMITH and WEAVER, in which SMITH supplied WEAVER with "one or two" of an unknown weight of an unknown drug.

85. Since the January 2023 suspected drug transaction, investigators have intercepted multiple phone calls between WEAVER and SMITH including the one further described below, the latest of which occurred in March 2023. Investigators also observed SMITH meet with WEAVER in person on March 10, 2023. On that date, investigators intercepted multiple phone calls in which investigators believe UM 2233 and ███████ requested to purchase drugs from SMITH. Investigators then observed SMITH drive to the suspected stash houses at Target Locations 2 and 3, and then drive to Target Location 7. Investigators observed SMITH meet with WEAVER, then drive the two to the grocery store, and then back to WEAVER's Target Location 7 to drop WEAVER off. Investigators then observed SMITH drive to Target Location 5, at which investigators observed two suspected drug transactions between SMITH and ███████ and SMITH and UM 2233.

86.     Throughout the course of this investigation, investigators have observed multiple security cameras on the outside of Target Location 7, which appear to include coverage of the front door of the residence. The front windows to the residence are currently covered in black material from the inside of the residence, such that a person from the outside would not be able to see inside the residence. Based upon training and experience, I know that drug dealers commonly use security cameras to protect their supply of drugs, both from other criminals as well as law enforcement. Investigators believe, based on activity observed at the residence, that Target Location 7 appears dilapidated and is currently being renovated. It does not appear that anyone is currently living at Target Location 7. Furthermore, based on geolocation ping data from WEAVER's cell phone, WEAVER does not appear to be residing at Target Location 7, but rather Target Location 8.

87.     Based upon all the above, as well as my training and experience, I believe that WEAVER utilizes Target Location 7 in order to store drugs and conduct drug trafficking activities, and thus other evidence of drug trafficking will be present in addition to narcotics.

G.      **Target Location 8:** ████████████████████████

88.     Based upon information learned during the course of this investigation, investigators believe Target Location 8 to be the main residence utilized by WEAVER.

89.     Investigators conducted a utility records search on Target Location 8 in March 2023 and learned that the electric utilities are in the name of Marvin D. WEAVER Jr. Likewise, investigators conducted open source and law enforcement database checks of Target Location 8, and determined that WEAVER's driver's license listed Target Location 8 as his residence since at least April 2022.

41

90.     In March 2023, investigators conducted a search of open source and law enforcement databases in regards to WEAVER and Target Location 8. Investigators learned that WEAVER has been associated with Target Location 8 since at least 2022. Specifically, Target Location 8 appears on some of WEAVER's credit reports, bank account records, and vehicle registrations. For example, WEAVER has a Range Rover with Ohio license plate JLE 8730 that is registered at Target Location 8.

91.     During the course of this investigation, investigators obtained a search warrant for geolocation ping data from WEAVER's telephone in January 2023 and March 2023. Investigators reviewed the geolocation data and determined that WEAVER's phone was commonly within the radius of Target Location 8, including overnight into the early morning hours, consistent with times WEAVER was likely asleep. Investigators also determined that the geolocation ping data was frequently within the radius of Target Location 8 during daytime hours at which time one might be expected to be at work. Based on this, as well as other information obtained during the course of the investigation, I believe WEAVER's daily activity is not consistent with someone who is regularly employed. Investigators have discovered, however, that WEAVER appears to live a financial lifestyle that is consistent with someone who is gainfully employed.

92.     During the course of the investigation, investigators intercepted a call between SMITH and WEAVER in which WEAVER discussed WEAVER's plan for the future, and expressed a desire to get involved in a truck business. WEAVER stated he was "tired of what he was doing," to which SMITH responded he (WEAVER) had not been doing it that long. Based upon my training and experience as well as the context of the conversation, I believe that WEAVER expressed to SMITH a desire to stop trafficking drugs and instead get involved in a truck business.

42

93.     As set forth above, investigators intercepted multiple calls between SMITH and WEAVER on two separate occasions in January 2023, in which investigators believe the two arranged drug transactions. On January 1, 2023, investigators believe WEAVER sold drugs to ███████████ through SMITH, and on January 15, 2023, investigators believe WEAVER purchased drugs from SMITH.

94.     During the course of the investigation, investigators intercepted multiple phone calls between SMITH and WEAVER in which investigators overheard a cell phone ringing from WEAVER's end of the line. Based on the sound, investigators believe that WEAVER received a phone call on a separate cell phone on multiple occasions while talking with SMITH.  Based upon my training and experience, I know that drug dealers typically utilize multiple cell phones in order to conduct their drug trafficking activities and to evade law enforcement detection.

95.     Based upon my training and experience, I know that drug traffickers commonly store an amount of drugs at their residences, as well as drug proceeds, vehicles used in the facilitation of drug transactions, assets, ledgers, and items related to drug trafficking, including cell phones. I suspect that such items will be found at Target Location 8, including WEAVER's cell phone that was intercepted on the wire and used to arrange multiple drug transactions.

**H.     Target Location 9:** ██████████████████████

96.     Based upon information learned during the course of this investigation, investigators believe Target Location 9 to be the main residence utilized by ████████

97.     Investigators conducted an open source database check in March 2023 and learned that Target Location 9 is owned by ██████████████, and has been since 2022. Likewise, investigators conducted a utility check of the residence in March 2023, and learned that the electric service is listed in the name of ████████████

43

98.     Throughout the course of the investigation, investigators have discovered that ▮▮▮▮▮▮ has been associated with Target Location 9 since at least 2018. Specifically, Target Location 9 appears on vehicle registrations for ▮▮▮▮▮▮, as well as credit reports, and bank account records. ▮▮▮▮▮▮ listed Target Location 9 as her address on her driver's license. In addition, the subscriber information for ▮▮▮▮▮▮'s phone lists Target Location 9 as her address.

99.     Investigators obtained a search warrant to intercept geolocation ping data from ▮▮▮▮▮▮'s cell phone in March 2023. After reviewing the geolocation data, investigators learned that ▮▮▮▮▮▮'s cell phone was frequently within the radius of Target Location 9, including commonly during overnight hours to the early morning in which ▮▮▮▮▮▮ would likely be asleep.

100.    In March 2023, investigators obtained a search warrant authorizing the interception GPS location data of ▮▮▮▮▮▮'s cell phone via cell site simulator. On March 21, 2023, investigators intercepted ▮▮▮▮▮▮'s GPS location data and determined that ▮▮▮▮▮▮'s cell phone was located inside Target Location 9.

101.    On January 11, 2023, investigators intercepted multiple telephone calls between SMITH and KISNER. During the course of this investigation, investigators have learned that SMITH and SMITH DTO members frequently utilize coded language when discussing drugs, specifically referring to drugs as car parts. During the phone calls, KISNER requested to obtain one "filter" from SMITH. Investigators believed that SMITH and KISNER utilized coded language to arrange a drug transaction. The two agreed to meet up that day. Investigators conducted surveillance of SMITH and KISNER contemporaneous with the intercepted calls. Prior to the meet up, investigators observed SMITH drive to the suspected stash houses at Target

44

Locations 2 and 3 for a few minutes, and then drive to meet KISNER at a car wash located near Needmore Road. Investigators observed SMITH and KISNER park directly next to each other in the parking lot, so that the driver's doors were directly next to each other. Investigators then observed SMITH open the door to SMITH's vehicle, lean into KISNER's vehicle through KISNER's driver's side window such that SMITH's hands and torso were not visible, and then quickly return to SMITH's vehicle. Based upon my training and experience, I believe SMITH's actions were consistent with a hand-to-hand drug transaction. Both KISNER and SMITH then departed from the area, with SMITH ultimately returning to his residence at Target Location 1, and KISNER driving to ███████ 's residence at Target Location 9. Investigators observed KISNER park his vehicle on the driveway of Target Location 9, and then exit the vehicle holding a bag. Investigators observed ███████ come speak with KISNER on the driveway of Target Location 9. Based upon information learned throughout the course of the investigation, investigators believe ███████ to be the ████ of KISNER.

102. On March 7, 2023, investigators intercepted phone calls and texts between SMITH, KISNER, and ███████, in which I believe KISNER arranged for ███████ to pick up an amount of suspected drugs on KISNER's behalf. A portion of the transcript of the call is set forth below:

**March 7, 2023, at approximately 3:54 PM**
**Incoming call from 937-418-2497, KISNER**
**Session 11303**

KISNER:     Oh, I had a question for you. I didn't know…I can't get away but I didn't know if I could have ███ [Phonetic] meet you somewhere or somethin'?

SMITH:      Hmm-hmm. Yup, yup.

KISNER:     And can I pay you tomorrow?

SMITH:      Yeah, it [unintelligble]. You was good with me.

103.    Approximately 45 minutes later, ████████ called SMITH to arrange the

meeting for the drug transaction. A portion of the transcript of the call is listed below:

**March 7, 2023, at approximately 4:36 PM**
**Incoming call from** ██████████████████
**Session 11318**

██████████ :    [Unintelligible]

SMITH:    Hello?

██████████ :    Hey, what's going on?

SMITH:    Was up with you ████ [Phonetic]?

[LATER IN THE CALL]

SMITH:    Uh, I'm right— we just leaving the carpet store down here at Hamilton
[Phonetic]. So, let me get back up to the ci-, [Coughs] city and then I'mma
call you back soon as I get up there.

██████████ :    Okay. Yup, I will be around.

SMITH:    Uh, you know what? Ask him if did he need, uh, one filter or two? I
forgot.

██████████ :    Did what?

SMITH:    Ask him if he needs one filter or two filters? Just to make sure.

██████████ :    Okay, I'll, I'll ask him.

104.    Investigators    conducted    surveillance    of    SMITH    and    ██████████

contemporaneous with the calls. Investigators observed a truck travel in the alley behind the

suspected stash houses at Target Locations 2 and 3. Investigators observed ██████████ and

SMITH meet in a parking lot of a Harbor Freight. Investigators observed ██████████ exit

██████████'s vehicle and enter the passenger seat of SMITH's truck. SMITH'S truck matched

the description of the truck that was observed in the alley behind the suspected stash houses at

46

Target Locations 2 and 3. ███████ sat in the truck for a few minutes, then exited and returned to her vehicle. Based upon my training and experience, the actions of ████████ in the parking lot, as well as the intercepted conversation between KISNER and SMITH and ███████ and SMITH (in which the parties again reference "filters"), I believe a drug transaction took place between SMITH and ██████████ in SMITH's truck.

105.   Investigators maintained surveillance of ████████ as she traveled to a nearby grocery store parking lot and sat in her vehicle. ████████ then drove north towards her residence, at which time a Miami County Sheriff's Deputy conducted a traffic stop of ████████ for a traffic violation. The Miami County Sheriff Deputy noted that ███████ was extremely nervous during the traffic stop. ████████ gave the deputy permission to search ████████'s vehicle, but the deputy did not find any narcotics. Investigators then observed █████████ drive back to her residence at Target Location 9.

106.   On March 8, 2023, investigators intercepted a phone call between KISNER and SMITH in which the two discuss the traffic stop and search of ████████ the night before. During the call, SMITH asked KISNER where she put the drugs. A portion of the transcript of the call is listed below:

**March 8, 2023, at approximately 1:15 PM**
**Incoming call from 937-418-2497, KISNER**
**Session 11371**

SMITH:        Hello?

KISNER:      Hey, what's going on?

SMITH:        Oh, same shit different outfit.

[LATER IN THE CALL]

KISNER:      Listen to this. Last night, she was waiting on you to meet with her.

SMITH:      Yeah.

KISNER:     So, she stopped and had a drink. She met with you. She's coming up the interstate. Talking to me on the phone. Tipp City cop flew up behind her. Turned on her exit. She turned in to get gas and they pulled her over. Because uhh her right turn signal is out. S-Six fucking car-cop cars sitting there last night. They done a fuckin field sobriety test on her and searched her fucking truck.

SMITH:      You shittin me!

KISNER:     Huh uh, she was so fuckin nervous. Yep they searched her fuckin tr- tore the truck completely apart. Sobriety test, everything and let her go.

SMITH:      Did she smell like liquor?

KISNER:     She had one drink!

SMITH:      I mean…

KISNER:     So…

SMITH:      You know her, I'm just saying is that a lot for her? You know she a lil' - You have one drink…

KISNER:     No…

SMITH:      …you a big person! She little thang'!

KISNER:     Yeah, but she can drink so… [laughs]

SMITH:      I'm just sayin', but can, U/I can she-can you tell that she's drinking? That's what…

KISNER:     No, no, huh uh she can handle it pretty good so…

SMITH:      Mhmm… I bet she was thinkin' like- what sh-what she put the shit in, her pussy?

KISNER:     No, her fuckin' bra.

SMITH:      Her bra!

KISNER:     Yep!

SMITH:      And she got little titties! No she don't… she got [unintelligible].

48

KISNER:     Hey uh...they said uh...they said is there anything in the truck and he-she's like " no"   and he said-she, he said is there anything on you - she had her Bluetooth on…she's like "you can search anything you want. I just want to get home to my kids."   They did not pat her down!

SMITH:      Wow! You know what though, they woulda' had to bring a girl to do it. A guy can't-

KISNER:     Exactly.

SMITH:      -A guy can't pat a girl down!

KISNER:     Yep, if they'd a got her. If she'd a stumbled a little bit or whatever and took her into the fuckin' jail… my god.

SMITH:      Man…U/I she, she would-she woulda been need, needing to put it in her pussy though cuz they can't…

KISNER:     … yep.

SMITH:      Yeah that - even when you get into the jail they not about to go in your pussy.

KISNER:     They can do a cavity search if they want to!

SMITH:      I mean but they gotta have a reason to. They wouldn't a did it for-

KISNER:     Yeah…

SMITH:      …I don't think they'd a did a cavity search just based on drinking…

KISNER:     Yeah…[unintelligible].

SMITH:      Boy, that is crazy!

107.    Based upon training and experience, the context of the conversation, the actions of SMITH and █████████ on March 7, 2023, and information obtained throughout the course of the investigation, investigators believe a drug transaction occurred between SMITH, KISNER, and █████████ on March 7, 2023. KISNER requested for SMITH to meet with █████████ on KISNER's behalf. SMITH asked █████████ if KISNER wanted one or two "filters," which I

49

Case: 3:23-mj-00110-CHG Doc #: 8-1 Filed: 08/20/25 Page: 51 of 83 PAGEID #: 166

believe is coded language for drugs. SMITH drove to the suspected stash houses (Target Locations 2 and 3) and then met up with ▮▮▮▮▮ in SMITH's truck in a parking lot for a period of a few minutes. When ▮▮▮▮▮ was later traffic stopped, law enforcement did not find narcotics in her vehicle because ▮▮▮▮▮ hid the narcotics in her bra.

I.    **Target Location 10:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

108.    Based upon information learned during the course of this investigation, investigators believe Target Location 10 to be the main residence utilized by KISNER.

109.    Investigators conducted an open source database check in March 2023 and learned that Target Location 10 is owned by Daniel and ▮▮▮▮▮ and has been since 2020. Likewise, investigators conducted a utility check of the residence in March 2023, and learned that the electric service is listed in the name of ▮▮▮▮▮. Investigators believe ▮▮▮▮▮ to be the ▮▮ of KISNER.

110.    Throughout the course of the investigation, investigators have discovered that KISNER has been associated with Target Location 10 since at least 2020. Specifically, Target Location 10 appears on vehicle registrations for KISNER, as well as credit reports.

111.    Investigators obtained a search warrant to intercept geolocation ping data from KISNER's cell phone in March 2023. After reviewing the geolocation data, investigators learned that KISNER's cell phone was frequently within the radius of Target Location 10, including commonly during overnight hours to the early morning in which KISNER would likely be asleep.

112.    On March 21, 2023, investigators reviewed geolocation ping data from KISNER's cell phone that placed KISNER within the vicinity of Target Location 10. Investigators conducted physical surveillance in correlation with the geolocation ping data. Investigators observed KISNER depart from Target Location 10 on the morning of March 21. KISNER was observed

driving a vehicle registered to KISNER, in which investigators have previously observed KISNER driving, including to the January 2023 suspected drug transaction with SMITH. Investigators followed KISNER as he departed Target Location 10 and drove to Target Location 9. During the physical surveillance, investigators observed that the geolocation ping data from KISNER's phone moved consistent with KISNER's direction of travel, and ultimately placed KISNER within the vicinity of Target Location 9 when investigators observed KISNER meeting with ███████.

113.   As set forth above, investigators intercepted multiple phone calls between KISNER and SMITH in which investigators believe the two arranged drug transactions, including on January 11, 2023 and on March 7, 2023.

114.   On March 11, 2023, investigators intercepted multiple phone calls between KISNER and SMITH. Based upon training and experience as well as the context of the conversations, investigators believe SMITH and KISNER arranged another drug transaction. During the call, KISNER told SMITH that KISNER wanted to pay SMITH, and asked if he (KISNER) got another one, would it be "18?" Based upon training and experience, as well as the context of the conversation, I believe KISNER asked SMITH if KISNER could pay SMITH $1,800 for two units of an unknown amount of drugs, one previously fronted to ███████ on March 7, and another one requested by KISNER on March 11. Based upon the conversation, I believe that ███████ never delivered the March 7 fronted drugs to KISNER, and therefore KISNER needed another unit for his buyer. SMITH agreed to meet with KISNER later that day and deliver another "one" unit of drugs. Based upon a subsequent intercepted phone call, the two appeared to meet up in the parking lot of a Lowe's later that day.

115.    Based upon my training and experience, I know that drug traffickers commonly store an amount of drugs at their residences, as well as drug proceeds, vehicles used in the facilitation of drug transactions, assets, ledgers, and items related to drug trafficking, including cell phones. I suspect that such items will be found at Target Location 10, including KISNER's cell phone that was intercepted on the wire and used to arrange multiple drug transactions.

**J.      Target Location 11: 1588 Glenbeck Ave., Apt. B, Kettering, Ohio**

116.    Based upon information learned during the course of this investigation, investigators believe Target Location 11 to be the main residence of UM 2233.[17] Target Location 11 is located inside a multi-family dwelling that investigators believe contains a total of four apartments.

117.    As discussed above, investigators intercepted multiple phone calls between SMITH and UM 2233 on March 9 and 10, 2023. On March 9, 2023, investigators intercepted a call between UM 2233 and SMITH in which UM 2233 asked SMITH to put "one together" for him (UM 2233). UM 2233 then asked if the price came down, and mentioned that was selling for "27 or 26." UM 2233 discussed his business being slow, and requested "it" be "tight" like "y'all been doing." SMITH and UM 2233 then discussed the price of "one" for $800, and additional money that UM 2233 owes SMITH. Based upon training and experience, as well as the context of the conversation, investigators believe UM 2233 requested to purchase one ounce of cocaine from SMITH for $800. Based upon the conversation, investigators believe UM 2233 has purchased drugs from SMITH in the past on multiple occasions, and that UM 2233 owed money to SMITH incurred as a result of past drug transactions in which SMITH fronted UM 2233 drugs.

---

17. Based on information set forth in more detail below, investigators believe UM 2233 may be Anthony WATSON Sr.

118.    Investigators conducted surveillance of SMITH contemporaneous with the phone calls between SMITH and UM 2233 on March 10, 2023. That morning, investigators observed SMITH stop briefly at the suspected stash houses at Target Locations 2 and 3. Investigators maintained surveillance of SMITH throughout the day. Later that day, investigators intercepted a call between SMITH and UM 2233 in which SMITH directed UM 2233 to Target Location 5 in order to conduct the drug transaction. Investigators intercepted another call during which UM 2233 alerted SMITH that UM 2233 had arrived at Target Location 5, and that UM 2233 was in a black SS. Investigators observed a black Chevrolet Impala SS edition arrive at Target Location 5 and park on the street in front of Target Location 5. Investigators then observed SMITH exit Target Location 5, enter the passenger's seat of the Impala for a few minutes, exit the Impala, and then leave the area in the flatbed tow truck.   Investigators followed UM 2233 has he drove away from the area and back to Target Location 11.

119.    Based upon my training and experience, as well as the context of the intercepted telephone communications, I believe SMITH and UM 2233's actions were consistent with a drug transaction, and that a drug transaction occurred between the two, after which UM 2233 transported the drug directly back to Target Location 11.

120.    Based upon my training and experience, I know that $800 is equivalent with the retail price of one ounce of cocaine in today's market, and that SMITH sells cocaine, as verified from confidential source purchases. As discussed above, I believe a purchase of one ounce of cocaine is indicative of a drug dealer, as one ounce is too much for personal use. Based upon the March 9, 2023 intercepted call between UM 2233 and SMITH in which UM 2233 mentioned business being slow, I believe that UM 2233 likely has not sold all of the drugs UM 2233 obtained from SMITH and therefore is likely storing them at UM 2233's residence at Target Location 11.

53

121. After the March 2023 deal between SMITH and UM 2233, investigators obtained a search warrant to intercept geolocation ping data from UM 2233's cell phone in March 2023. After reviewing the geolocation data, investigators learned that UM 2233 cell phone was frequently within the radius of Target Location 11, including commonly during overnight hours to the early morning in which UM 2233 would likely be asleep.

122. In March 2023, investigators obtained a search warrant authorizing the interception GPS location data of UM 2233's cell phone via cell site simulator. On March 21, 2023, investigators intercepted UM 2233's GPS location data and determined that UM 2233's cell phone was located on the east side of the apartment building in which Target Location 11 is located.

123. On March 21, 2023, investigators reviewed geolocation ping data from UM 2233's cell phone that placed UM 2233 within the vicinity of Target Location 11. Investigators conducted physical surveillance in correlation with the geolocation ping data. Investigators observed UM 2233 depart from Target Location 11 during the late morning of March 21. UM 2233 was observed driving a vehicle registered to ███████. Investigators followed UM 2233 as he departed Target Location 11 and drove to various locations east of his residence. During the physical surveillance, investigators observed that the geolocation ping data from UM 2233's phone moved consistent with UM 2233's direction of travel. Later that day, investigators observed UM 2233 return to Target Location 11, and geolocation ping data placed UM 2233 within the vicinity of the residence as well. Investigators observed UM 2233 walk to the front of the residence and check for mail from the mailbox listed as 1588 Glenbeck Ave., Apt. B, Kettering, Ohio (Target Location 11). UM 2233 then went inside the front door to the apartment building.

54

124.    Investigators searched law enforcement databases for the vehicle that UM 2233 was seen driving on March 21, 2023. Investigators determined that the vehicle was registered to ███████████ at Target Location 11. Further investigation revealed that ███████████ is ███ to Anthony WATSON Sr. Investigators obtained photographs of WATSON, including a driver's license photo, and the photos matched the physical appearance of UM 2233. Investigators then conducted a search of law enforcement databases for WATSON, and discovered that there are multiple credit reports for WATSON that list an address as 1588 Glenbeck Ave. The address listed on the credit reports does not specify an apartment number.

125.    In March 2023, investigators conducted a utility check of Target Location 11, and learned that the electric utilities for Apartment B are listed in the name of ███████████, the ███████ of WATSON. Investigators also confirmed that the electric utilities for Apartments A, C, and D are not in the name of WATSON or ███████████. In reviewing photographs of the other utility owners, investigators determined that no one matched UM 2233 observed by law enforcement other than WATSON.

126.    Based upon my training and experience, I know that drug traffickers commonly store an amount of drugs at their residences, as well as drug proceeds, vehicles used in the facilitation of drug transactions, assets, ledgers, and items related to drug trafficking, including cell phones. I suspect that such items will be found at Target Location 11, including UM 2233's cell phone that was intercepted on the wire and used to arrange a March 2023 drug transaction.

**K.    Target Location 12:** ███████████████████

127.    Based upon information learned during the course of this investigation, investigators believe Target Location 12 to be the main residence utilized by BURNS.

128.    In March 2023, investigators conducted an open source database check of Target Location 12 and learned that it is owned by Gregory BURNS, and has been since 2018. Likewise, investigators conducted a utilities check of Target Location 12 in March 2023 and learned that the electric utilities are in the name of Gregory BURNS.

129.    Throughout the course of the investigation, investigators have discovered that BURNS has been associated with Target Location 12 since at least 2018. Specifically, Target Location 12 appears on multiple vehicle registrations for BURNS, as well as credit reports and bank account records. In addition, investigators discovered an articles of organization filed with the Ohio Secretary of State in 2021 in which BURNS registered an LLC (named Frankz Auto Sales) with a listed business address of Target Location 12. BURNS is listed as the registrant for the LLC, and provided a receipt address as Target Location 12.

130.    During the March 2023 controlled purchase operation from BURNS, a confidential source placed a recorded phone call to BURNS to arrange the drug transaction. Investigators believe that this phone contains evidence of the March 2023 drug transaction, as well as evidence of other drug transactions and co-conspirators. Based upon my training and experience, I know that drug traffickers typically travel with their cell phones on their person and keep the phones with them, including overnight at their residences. I believe BURNS's cell phone (and therefore evidence of BURNS's drug trafficking activities) is likely located with BURNS inside BURNS's residence at Target Location 12.

131.    In October of 2022, investigators obtained information from CS-3 about BURNS's drug trafficking activities. CS-3 stated BURNS always carries a smaller amount of drugs with BURNS when he travels to Target Location 13 in order to conduct drug transaction. CS-3 stated, however, that BURNS keeps larger quantities elsewhere.

132. Based upon my training and experience, I know that drug traffickers commonly store an amount of drugs at their residences, as well as drug proceeds, vehicles used in the facilitation of drug transactions, assets, ledgers, and items related to drug trafficking, including cell phones. I suspect that such items will be found at Target Location 12, including BURNS's cell phone that was used to facilitate a drug transaction with CS-3 in March 2023.

**L.     Target Location 13: 806 Goodlow Ave., Dayton, Ohio**

133. Based upon information learned during the course of this investigation, investigators believe Target Location 13 to be a business front utilized by BURNS to store drugs and drug proceeds, and to conduct drug transactions. Target Location 13 is a car wash that investigators believe to be a front for BURNS's and SMITH DTO members money laundering and drug trafficking activities.

134. In March 2023, investigators conducted an open source database check of Target Location 13 and learned that it is owned by Gregory BURNS and has been since October 2022. Investigators also learned that the previous owner of Target Location 13 just prior to BURNS was ███████. As noted above, investigators believe ████████ to be the ███ of SMITH, and to reside at one of SMITH's suspected stash houses (Target Location 2). Based upon information learned throughout the course of the investigation, investigators believe ████████ is also a ████████ of BURNS, but have been unable to verify this information.

135. Investigators conducted a utility check of Target Location 13 in March 2023, and learned that the electric utilities are listed in the name of ████████. At this point in time, investigators are not sure of the connection between ████████ and BURNS, and/or other DTO members.

136.    Investigators have previously conducted controlled purchase operations in which a confidential source has purchased an amount of methamphetamine and fentanyl from BURNS at Target Location 13. CS-3 purchased various amounts of methamphetamine and fentanyl from BURNS in July 2022 and August 2022, both of which occurred at Target Location 13. During the controlled purchase operations, CS-3 observed a firearm at Target Location 13. Furthermore, during both operations, BURNS pulled out a quantity of drugs and weighed the proper amount for CS-3 in CS-3's presence.   During both operations, CS-3 arrived at Target Location 13 without first calling BURNS. CS-3 stated that BURNS was known to be at Target Location 13 during the day, and that CS-3 could just show up unannounced and purchase narcotics. Based upon the actions of BURNS during these controlled purchase operations, I believe BURNS stores narcotics at Target Location 13.

137.    In March 2023, investigators conducted another controlled purchase operation in which CS-3 purchased an amount of suspected meth and fentanyl from BURNS. At the direction of investigators, CS-3 placed a recorded phone call to BURNS, during which the two agreed to meet at Target Location 13. BURNS and CS-3 met at Target Location 13, and CS-3 then purchased an amount of suspected methamphetamine and fentanyl from BURNS. Consistent with his past dealing, BURNS pulled out a quantity of drugs and weighed the proper amount for CS-3 in CS-3's presence. During this operation, CS-3 noted that the drugs purchased by CS-3 were already stored within Target Location 13. Based upon the actions of BURNS during this controlled purchase operation, I believe BURNS stores narcotics at Target Location 13.

**SUMMATION**

138.    Based on my training and experience, I know that drug traffickers frequently engage in the following common practices and activities:

a.      It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

b.      It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c.      That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d.      It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.      It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business and keep this contraband at their personal residences or at stash houses.

f.      It is common practice that, at their residences or stash houses, drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs.   Drug traffickers commonly front (provide drugs on consignment) to their clients.   The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them, such as their residences or at stash houses.

g.      It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

59

h.      That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i.      When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.  Drug traffickers frequently keep such records at their residences or at stash houses.

j.      Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.   Drug traffickers frequently keep records relating to such travel at their residences or at stash houses.

k.      It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization.   This information can often be stored in cellular phones in places such as the contacts list.   Drug traffickers frequently keep such materials at their residences or at stash houses.

60

l.      Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences, businesses, stash houses of drug traffickers.  Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

m.      Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms and ammunition of various types.   Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.      Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.      The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations.   Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another.   When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers.   The wholesale distributors often have more than one source of supply,

and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

        p.     Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

        q.     I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

        r.     Drug traffickers often use computers to perform research concerning travel plans to meet sources of supply, store photographs of associates, drugs, firearms, and other contraband.

s.      Drug traffickers frequently maintain at their residences or stash houses controlled substances as well as items used to process, sell and distribute these illegal drugs such presses, scales, baggies, vacuum sealers, cutting agents, gloves, masks, and other items.

139.    Based on the foregoing, I respectfully submit that there is probable cause to issue search warrants for the above-described locations.

Respectfully submitted,

JASON BARNES (Affiliate)  Digitally signed by JASON BARNES (Affiliate)
                          Date: 2023.03.23 12:02:14 -04'00'

Jason M. Barnes
Task Force Officer
Drug Enforcement Administration

**By reliable electronic means (telephone)**

Subscribed and sworn to before me on this **23rd** day of March 2023.

Caroline H. Gentry
United States Magistrate Judge

63

**ATTACHMENT A -1**

**PROPERTY TO BE SEARCHED**

2030 Aspen Ridge Ct., Miami Township, Ohio, **(Target Location 1)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 1** is a two story single family dwelling, gray in color. The driveway for **Target Location 1** is an "S" shaped curved driveway that rises in elevation from the street to the house. There is a stone retaining wall along parts of the driveway, and the view of **Target Location 1** from the street is obscured by several large pine trees. **Target Location 1** is further depicted in the following photographs.





**ATTACHMENT A -2**

**PROPERTY TO BE SEARCHED**

███████████████████, **(Target Location 2)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 2** is a single-story, single-family dwelling, with yellow siding and maroon accents and shutters. The numbers "██" are affixed horizontally on the front of the residence. The front door is white in color, on top of which is a black barred storm door. A detached garage is located behind the residence. **Target Location 2** is further depicted in the following photograph.



**ATTACHMENT A -3**

**PROPERTY TO BE SEARCHED**

█████████████████████, **(Target Location 3)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. {description}.  **Target Location 3** is a single story, single family dwelling, gray in color with white trim. The numbers "██" are affixed vertically on the left side of the front of the residence. There is a detached garage located behind the residence. **Target Location 3** is further depicted in the following photograph.



**ATTACHMENT A -4**

**PROPERTY TO BE SEARCHED**

██████████████████, **(Target Location 4)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 4** is a two-story, single-family dwelling, The exterior appears to have dilapidated siding, but gray in color. The front door and shutters are baby blue in color. **Target Location 4** is further depicted in the following photograph.



## ATTACHMENT A -5

## PROPERTY TO BE SEARCHED

███████████████████ **(Target Location 5)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 5** is a single story, single family dwelling, white in color with a gray roof. The front door is white in color, with a black barred storm door on top of it. The numbers "██" are affixed to the front of the residence on the left side of the front door. **Target Location 5** is further depicted in the following photograph.



**ATTACHMENT A -6**

**PROPERTY TO BE SEARCHED**

2412 North Gettysburg Ave., Dayton, Ohio, **(Target Location 6)** specifically to include the entire area within the fence line, main building, the curtilage, any vehicles located within the curtilage at this location, but not to include any separate secure buildings. **Target Location 6** consists of a large, fenced in lot that includes one main building with three additional outbuildings. The main building is described as one large, multi-story tan and gray building affixed with the numbers "2412" located directly east of N. Gettysburg. Behind the main building, there are three outbuildings of various sizes. **Target Location 6** is further depicted in the following photographs. Investigators have added highlighted language specifying the main building from the outbuildings in the below aerial photographs.







## ATTACHMENT A -7

## PROPERTY TO BE SEARCHED

████████████████████ **(Target Location 7)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 7** is a single-story, single-family dwelling, yellow in color with a gray roof. The front door to the residence is white in color, and the numbers "████" area affixed to the residence to the right of the front door. There is a detached garage on the north end of the property. **Target Location 7** is further depicted in the following photograph.



## ATTACHMENT A -8

## PROPERTY TO BE SEARCHED

████████████████████████, **(Target Location 8)** including any garages, vehicles, storage units, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 8** is a single-family apartment located within a multi-unit apartment complex. **Target Location 8** is located on the second floor of the multi-unit building. There is a gold door knocker affixed to the door, below which is affixed the letters "██." **Target Location 8** is further depicted in the following photographs, which show the multi-unit apartment building, as well as the door to **Target Location 8**.





**ATTACHMENT A -9**

**PROPERTY TO BE SEARCHED**

███████████████████████████ **(Target Location 9)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 9** is a single-story, single-family residence, yellow in color, with maroon trim and shutter. There is a red star affixed to the front of the residence. There is a "U" shaped driveway on the property that goes behind the residence on the north and south side. There is a detached garage, maroon in color, towards the rear of the property. **Target Location 9** is further depicted in the following photograph.



**ATTACHMENT A -10**

**PROPERTY TO BE SEARCHED**

██████████████████████████ **(Target Location 10)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 10** is a single-story, single-family residence, partially gray in color, and with some stone walls. There is a detached garage to the south of the residence. There is also a detached pole barn located on the southern end of the property. **Target Location 10** is further depicted in the following photograph.



## ATTACHMENT A -11

## PROPERTY TO BE SEARCHED

1588 Glenbeck Ave., Apt. B, Kettering, Ohio, (**Target Location 11**) including any garages, vehicles, storage units, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 11** is a single-family apartment located within a multi-unit apartment building. There are a total of four apartments located within the multi-unit building, one of which is **Target Location 11. Target Location 11** is located on the first floor of the multi-unit building. There is a gold "B" affixed to the door.  The bottom floor of the building contains a garage that is accessible from the rear of the building. **Target Location 11** is further depicted in the following photographs





**ATTACHMENT A -12**

**PROPERTY TO BE SEARCHED**

███████████████████, **(Target Location 12)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 12** is a single-family residence, tan in color with a dark roof. The front door is white in color, and has a black barred storm door. **Target Location 12** is further depicted in the following photograph.



## ATTACHMENT A -13

## PROPERTY TO BE SEARCHED

806 Goodlow Ave., Dayton, Ohio, **(Target Location 13)** including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets, or outbuildings associated with that address. **Target Location 13** is a commercial building, tan in color, with a front door to the left of the building, and a separate overhead garage door to the right on the front of the building. **Target Location 13** is further depicted in the following photograph.



**ATTACHMENT B**

I submit that there is probable cause to search for evidence, contrabands and fruits of violations of 21 U.S.C. § 841(a)(1), 846 (possession with intent to distribute controlled substances and conspiracy to commit the same), 21 U.S.C. § 843(b) (use of a communication facility to commit a felony and 18 U.S.C. §§ 1956 and 1957 (money laundering) including, but not limited to the following items:

A.  Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances and/or the laundering of money.

B.  Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.  Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D.  Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.  Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F.  United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.  Proceeds of drug trafficking activity or any items used to facilitate drug trafficking activity, including automobiles.

H.  Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

I.  Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys,

deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

J.     Illegal drugs, including, but not limited to fentanyl, methamphetamine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

K.     Firearms and ammunition.

L.     Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

M.     Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations.

N.     Records relating the founding, purpose, and maintenance of Buckeye Red Ltd., Buckeye Dirt LLC, and Buckeye Invested LLC.